IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| Chicago Regional Council of Carpenters, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | No. 15 C 7614 |
| Richard M. Resnick, as Administrator to the Plan for Settlement of Jurisdictional Disputes in the Construction Industry, | ) ) ) ) ) | |
| Defendant, | ) ) | |
| and | ) ) | |
| Prime Scaffold, Inc., | ) ) | |
| Defendant/Counter-Plaintiff. | ) | |

MEMORANDUM OPINION AND ORDER

This action arises out of a multi-party labor dispute over work performed on a construction project at the Zurich American Insurance Company Headquarters in Schaumburg, Illinois (the "Zurich Project"). On August 28, 2015, the Chicago Regional Counsel of Carpenters (the "Carpenters Union") sued defendants Richard Resnick, as Administrator to the Plan for Settlement of Jurisdictional Disputes in the Construction Industry (the "National Plan") and Prime Scaffold, an employer in the construction industry and subcontractor on the Zurich Project, seeking a declaratory judgment and injunctive relief. In the now-operative Second Amended Complaint, the Carpenters Union

seeks: 1) a declaration that it is not bound by any decision entered pursuant to the National Plan, and has no obligation to engage in the dispute resolution procedure set forth in the National Plan; 2) an order vacating an arbitration award entered in Prime's favor and against the Carpenters Union pursuant to the National Plan; and 3) damages for Prime's alleged breach of contract.

Prime asserts a two-count counterclaim against the Carpenters Union. First, Prime seeks to enjoin the Carpenters Union from taking coercive action or asserting damages against a the Anning-Johnson Company--a third party that subcontracted certain work on the Zurich Project to Prime--or from pursuing a change in work assignments on the Zurich Project through any means other than provided in the various contracts governing the project. Second, Prime seeks an order confirming the arbitration award that the Carpenters Union challenges.

Before me are two motions to dismiss. The first is by defendant Resnick, who argues that count I of the complaint should be dismissed on the grounds that: 1) I have no personal jurisdiction over the National Plan[1]; 2) subject matter jurisdiction is also lacking because plaintiff's claim against the National Plan is moot; and 3) the National Plan is not the real party in interest to this dispute. The second motion is by the Carpenters Union. It seeks dismissal of

---

[1] Because Resnick is sued in his capacity as Administrator of the National Plan, references to "Resnick" and to "the National Plan" are interchangeable.

Prime's counterclaim for injunctive relief on the ground that the anti-injunction provisions of the Norris-LaGuardia Act, 29 U.S.C. § 113, divests me of jurisdiction to grant such relief. For the following reasons, I grant the first motion and deny the second.

I.

To understand the claims and arguments that the parties raise, some background is essential. I take the following facts from the parties' respective pleadings, the exhibits attached thereto, and other evidence I may properly consider at this juncture.

The general contractor on the Zurich Project is a company called Clayco. Clayco subcontracted certain work on the project to Anning-Johnson, which further subcontracted the project's scaffolding work to Prime. Anning-Johnson is a signatory to a collective bargaining agreement with the Carpenters Union (the "Carpenters CBA"), while Prime is a signatory to a collective bargaining agreement with the General Laborers District Council of Chicago and Vicinity (the "Laborers Union") and is not a signatory to the Carpenters CBA. Prime thus assigned members of the Laborers Union to perform the scaffolding work on the Zurich Project.

The Carpenters Union and the Laborers Union are affiliates of the Chicago and Cook County Building and Construction Trades Council (the "Chicago Building Trades Council"), and as a result of this affiliation, they are bound by the Standard Agreement between the Chicago Building Trades Council and the Construction Employers'

Association (the "Standard Agreement"). The Standard Agreement is also expressly incorporated into the Project Labor Agreement (the "PLA") that specifically governs the Zurich Project. All agree that the Carpenters Union and Prime are bound by the PLA.

The Standard Agreement establishes the Joint Conference Board (the "JCB") to facilitate the peaceful adjustment of jurisdictional disputes in the construction industry. Article VII of the Standard Agreement expressly acknowledges that it is an arbitration agreement. *See* Counterclaim ("CC") Exh. C, Art. VII. Article II specifies that all jurisdictional disputes must be arbitrated under the authority of the JCB, and it further states that "work will go on undisturbed" during the pendency of such arbitration. *Id*. at Art. II. Article VI similarly provides for final and binding arbitration of jurisdictional disputes before a JCB-selected arbitrator, subject to appeal under the National Plan, "if such an appeal is available under conditions determined by the Building and Construction Trades Department of the [AFL-CIO]." *Id*. at Art. VI.

The PLA also establishes a final and binding dispute resolution procedure for jurisdictional disputes that may arise in the course of the Zurich Project. This procedure culminates in the referral of unresolved disputes to the JCB as provided in the Standard Agreement. *See* Cmplt., Exh. A, ¶ 10. In addition, the PLA expressly prohibits any form of "self-help" to redress violations of the agreement, *see id.*, at ¶ 7, and it provides that no signatory shall instigate,

support, or participate in any strike, work stoppage, or picketing of the jobsite for any reason. *Id.* at ¶ 4.

Prior to the events giving rise to this dispute, the Building and Construction Trades Department of the AFL-CIO (the "Building Trades Department") and various employer associations established the National Plan, which is a contract-based dispute resolution procedure for resolving jurisdictional disputes over work assignments in the organized construction industry. Its purpose is to resolve disputes without strikes or other impediments to the job progress. CC at ¶ 7. The National Plan provides that "local jurisdictional boards" recognized by the Building Trades Department, of which the JCB is one, "shall be used in the first instance to bring about an agreement, settlement or decision," subject to appeal under the National Plan. Cmplt., Exh. E (National Plan) at Art. VIII.

On August 14, 2015, the Carpenters Union sent a letter to Anning-Johnson claiming that Anning-Johnson's subcontract with Prime violated the Carpenters CBA. Cmplt. at ¶ 17 and Exh. C. Specifically, the Carpenters Union stated that because the Carpenters CBA required Anning-Johnson to subcontract all work performed on the Zurich Project to a signatory to that agreement, and because Prime was not a signatory to that agreement, Anning-Johnson was required to "maintain daily records of [Prime]'s jobsite hours and pay the appropriate wages and fringe benefit contributions," warning that "[f]ailure to do so will result in your liability not only for such

contributions, but for any reasonable Attorney's fees incurred in collecting these monies as well as interest and liquidated damages." *Id*. The Carpenters Union closed its letter by stating, "you must understand that we will enforce compliance with the Collective Bargaining Agreement and will use every legal means to do so." *Id*.

Prime interpreted the Carpenters Union's letter to Anning-Johnson as an "Impediment to Job Progress" as defined in Article III of the Procedural Rules and Regulations of the National Plan. *See Cmplt.*, Exh. E (Procedural Rules) at Art. III.[2] The National Plan prohibits impediments to job progress such as strikes, work stoppages, or picketing over jurisdictional disputes, and the Procedural Rules set forth procedures to be followed in the event of such an impediment. *See* Declaration of Richard Resnick ("Resnick Decl.") at ¶ 13; Cmplt., Exh. E (Procedural Rules) Arts. III, IV. Prime invoked these procedures on August 18, 2015, sending a "written notice of an impediment to job progress" to defendant Resnick in which it requested that the National Plan process the Carpenters Union's August 14, 2015, letter to Anning-Johnson as provided in Articles II and IV of the Procedural Rules. Cmplt., Exh. D. Prime's letter to Resnick asserted that all parties involved—the Laborers

---

[2] The Procedural Rules and Regulations of the National Plan and the National Plan itself are contained in a single document that is attached to the complaint as Exhibit E. Because the Procedural Rules and the National Plan have separately numbered articles, my citation to this Exhibit contain a parenthetical "(Procedural Rules)" or "(National Plan)" to indicate which portion of the document is being referenced.

Union, the Carpenters Union, Prime, and Anning-Johnson—were stipulated to the National Plan.

On August 19, 2015, Resnick wrote to the Carpenters Union's national parent, the United Brotherhood of Carpenters and Joiners of America ("UBC"), advising it of Prime's complaint of an impediment to job progress by the Carpenters Union, and requesting that UBC take "appropriate action to cause your local union to cease the alleged violation and to process any jurisdictional disputes that arise through the Chicago Joint Conference Board." Resnick Decl., Exh. 3. On the same day, the Carpenters Union wrote to Resnick, objecting to Prime's invocation of the National Plan. The Carpenters Union asserted that Anning-Johnson's subcontract with Prime violated the Carpenters CBA, and stated that its letter to Anning-Johnson was intended to notify Anning-Johnson of the violation and to enforce the CBA, claiming that it did not threaten to strike the project or to instigate a work stoppage.[3] The Carpenters Union additionally denied that it was stipulated to the National Plan and asserted that pursuant to the PLA, any jurisdictional disputes in conjunction with the Zurich Project were to be referred to the JCB. Cmplt. at ¶¶ 9-10, 12, 27.

---

[3] Although the pleadings do not say so explicitly, it is clear from the parties' arguments and references to a potential "strike" by the Carpenters Union that although the Laborers Union represented the employees performing scaffolding work on the Zurich Project, the Carpenters Union represents employees performing other work on the project.

Resnick sent a second letter to UBC on August 20, 2015, indicating that the Carpenters Union had contested the National Plan's jurisdiction, but that in his view, it was appropriate to process impediment to job progress claims involving parties bound by the Standard Agreement under the National Plan, "to insure that jurisdictional disputes covered by that agreement are resolved through the [JCB], rather than through grievances filed under individual collective bargaining agreements." Cmplt., Exh G. Resnick copied the JCB on this communication, inviting it to notify him if it disagreed with his interpretation of the interplay between JCB procedures and the procedures governing impediment to job progress claims under the National Plan. *Id*.[4]

For reasons not relevant here, Prime's impediment to job progress claim then lay dormant for several months. But on October 6, 2015, after learning that Prime's dispute with the Carpenters Union remained unresolved (indeed, this suit had been filed in the interim), Resnick informed UBC and the Laborers International Union (i.e., the Laborers Union's parent) that pursuant to Plan procedures, a hearing on Prime's complaint would be held before Arbitrator Paul Greenberg in Washington D.C. on October 9, 2014. Cmplt., Exh. H.

---

[4] The record does not contain any response by JCB, but the arbitrator's decision suggests that the JCB expressed a favorable view of Resnick's position, noting that the JCB "has concurred with [Resnick's] approach, as recently as confirmed again in correspondence dated August 21, 2015." Cmplt., Exh. J. at 4. I reiterate, however, that the issue of whether the Carpenters Union is stipulated to the Plan is not presently before me.

The Carpenters Union wrote to Arbitrator Greenberg the following day, indicating that it would not participate in the hearing, citing its position that the National Plan had no jurisdiction over the dispute. *Id.* at Exh. I.

Arbitrator Greenberg proceeded with the hearing, which was attended only by the Laborers International Union. After examining the evidence, the arbitrator issued a decision addressing two issues: first, whether the National Plan and the arbitrator had jurisdiction over Prime's complaint against the Carpenters Union; and second, whether the Carpenters Union's August 14, 2015, letter to Anning-Johnson constituted an "impediment to job progress" under the National Plan and its procedural rules. *See* Cmplt., Exh. J. The arbitrator concluded that the answer to both questions was "yes."

II.

I begin with defendant Resnick's motion and turn first to the question of whether I may appropriately assert personal jurisdiction over the National Plan. The parties agree that once a defendant challenges personal jurisdiction, a plaintiff must go beyond the allegations of the complaint and present *prima facie* evidence of jurisdiction. *Purdue Res. Found v. Sanofi-Synthelabo, S.A.*, 338 F.3d 773, 782 (7th Cir. 2003). I may consider affidavits attesting to jurisdictional facts and must resolve any conflicts between them in plaintiff's favor. *Felland v. Clifton*, 682 F.3d 665, 672 (7th Cir. 2012).

Because there is no dispute that the National Plan is not subject to general jurisdiction in Illinois, the jurisdictional analysis boils down to whether the National Plan's "minimum contacts" with the state satisfy the constitutional due process requirements for specific jurisdiction. *See Illinois v. Hemi Group, LLC*, 622 F.3d 754, 758 (7th Cir. 2010) (reaffirming that there is no "meaningful difference between the federal and Illinois due process standards"). Specific jurisdiction "is available for a suit that arises out of the forum-related activity." *Advanced Tactical Ordnance Systems, LLC v. Real Action Paintball, Inc.,* 751 F.3d 796, 800 (7th Cir. 2014). Accordingly, "the relevant contacts are those that center on the relations among the defendant, the forum, and the litigation." *Id*. at 801. But "not just any contacts will do: 'For a state to exercise jurisdiction consistent with due process, the defendant's *suit-related* conduct must create a substantial connection with the forum State.'" *Id*. (quoting *Walden v. Fiore*, 134 S. Ct. 1115, 1121 (2014)) (emphasis in *Advanced Tactical*).

Here, all agree that the National Plan is located in Washington, D.C., and that all of its activities take place there. Indeed, there is no dispute that Resnick communicated with the Carpenters and Laborers Unions only through their national or international affiliates located in Washington, and that he affirmatively declined to reach out to the Carpenters Union in Illinois. Specifically, Resnick did not respond directly to the Carpenters Union's letter

objecting to Prime's complaint, but instead forwarded it to the UBC's jurisdictional director, explaining that Plan procedures prohibited him from taking action on the Carpenters Union's correspondence. See Resnick Decl. at Exh. 5 (advising, "[i]f you just want to resend the letter saying the International adopts and incorporates [Carpenters Union's] position...that will allow me to recognize it.").

The Carpenters Union acknowledges that all of the National Plan's activities take place in Washington D.C. but argues that personal jurisdiction is appropriate because the National Plan is "open to do business" in Illinois (as it is in every state), and because the "effect" of decisions made pursuant to the National Plan "is directed solely at the jobsite where the disputed work is being performed," citing *Monster Energy Co. v. Wensheng*, 2015 U.S. Dist. LEXIS 132283 (N.D. Ill. Sept. 29, 2015) (Lefkow, J.), and *Illinois v. Hemi Group, LLC*, 622 F.3d 754, 758 (7th Cir. 2010). In each of those cases, the court indeed held that jurisdiction was proper over a company that "held itself out as open to do business with every state (including Illinois)" and "stood ready and willing to do business with Illinois residents." *Hemi*, 622 F.3d at 758. *See also Monster Energy*, 2015 U.S. Dist. LEXIS 132283, at *17. Resnick seizes on certain commercial activities that the defendants in those cases engaged in that have no direct counterpart here, such as advertising products on interactive websites and accepting and filling orders from individuals with Illinois addresses. But it is clear from the

evidence that the National Plan systematically engages with Illinois and its residents in other ways. For example, the parties agree that the National Plan has recognized the JCB as a "local jurisdictional board" and has a long history of asserting its own jurisdiction to process impediment to job progress claims involving parties stipulated to it. Resnick Decl., Exh. 7 (Resnick 8/20/15 Ltr. to UBC) (describing his "consistent" rulings asserting the National Plan's jurisdiction in such cases); *see also* Cmplt., Exh. J (Arbitrator's decision) at 4 (describing "a longstanding understanding between the [National] Plan and the [JCB] that *parties stipulated to the local board* have access to the Plan's 'impediment' mechanism.") (original emphasis). Indeed, Arbitrator Greenberg described the relationship between the JCB and the National Plan as "somewhat symbiotic." This evidence supports the conclusion that the National Plan is, in a meaningful sense, "open for business" with Illinois residents through the JCB, and that jurisdiction over it is appropriate in a suit involving Illinois entities stipulated to the JCB through the Standard Agreement.

Resnick's second argument for dismissal is that because his involvement in the case is over, the Carpenters Union's claim against him is moot. The Carpenters Union counters that ordinary principles of mootness do not apply because its declaratory claim challenges Resnick's ongoing policy of processing impediment to job progress complaints involving parties bound by the Standard Agreement, and the

policy weighs heavily on the Carpenters Union regardless of whether Resnick is currently involved in the present case because the Carpenters Union is a signatory to other PLAs that incorporate the Standard Agreement. The Carpenters Union also argues that Resnick's involvement in the case was so brief that the "capable of repetition yet evading review" exception to the mootness doctrine applies. Both sides rely on *Milwaukee Police Ass'n v. Board of Fire & Police Comm'rs*, 708 F.3d 921, 931 (7th Cir. 2013).

In *Milwaukee Police Ass'n*, the Seventh Circuit explained that where a litigant seeks declaratory relief to challenge an ongoing policy, the case may proceed even after the dispute that prompted the litigation is resolved, so long as the facts alleged reflect "a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Id*. at 930. The Carpenters Union offers evidence that in the past two years, it has been signatory to thirty-five project labor agreements in Cook County that incorporate the Standard Agreement,[5] and that there have been "several occasions" when employers or other unions "have appealed to the National Plan to find an Impediment to Job Progress." Declaration of Keith Jutkins, ("Jutkins Decl.") at ¶¶ 5-6. But the Carpenters

---

[5] The Carpenters Union also states that it is signatory to sixty-three project labor agreements in which work is currently taking place, but the evidence does not reveal where the PLAs were signed or where the jobsites are located.

Union's unadorned statement that it has been involved in such proceedings in the past, without any discussion of the circumstances that gave rise to those proceedings, or any evidence of the effect the proceedings had on the Carpenters Union, does not, standing alone, establish the existence of a "continuing and brooding presence" that "casts ... a substantial adverse effect" on the Carpenter's Union. *Milwaukee Police Ass'n*, 708 F.3d at 930.

Nor is there merit to the Carpenters Union's claim that it is unable to challenge the National Plan's jurisdiction because Resnick's involvement in the case was too ephemeral. Indeed, the issue of the National Plan's jurisdiction is presently before me in Count II of the complaint, as well as in Count II of the counterclaim, which seek, respectively, to vacate and to affirm the arbitrator's decision. Arbitrator Greenberg explicitly addressed and decided the threshold issue of the National Plan's jurisdiction over Prime's impediment to job progress complaint, and that issue will necessarily be central to my review of his decision. Accordingly, even assuming that the situation giving rise to the Carpenters Union's claim in this case is capable of repetition, it cannot meaningfully be said to evade review, regardless of whether the National Plan remains a defendant. Under these circumstances, I am not persuaded that a departure from ordinary mootness principles is warranted.

In any event, there is merit to Resnick's third argument for dismissal, which is that because Prime, not the National Plan, is the real party in interest to this dispute, the National Plan should be dismissed under *Caudle v. American Arbitration Ass'n*, 230 F.3d 920 (7th Cir. 2000), and *International Medical Group, Inc. v. Am. Arbitration Association*, 312 F.3d 833 (7th Cir. 2002) ("*IMG*"). In *Caudle*, the court explained that like judges, arbitrators "have no interest in the outcome of the dispute between [the parties], and they should not be compelled to become parties to that dispute." 230 F.3d at 922 (internal quotations and citation omitted). The court went on to explain that this principle could be understood as "immunity," or, alternatively, as "a conclusion that arbitrators and organizing bodies are not the real parties in interest." *Id*.

The court confronted the issue again in *IMG*, a case in which the plaintiffs "were so displeased at being drawn into an arbitration proceeding that they sued not only the claimant who drew them in, but also his lawyers, their law firm, the American Arbitration Association," and others. *Id*. at 838. The plaintiffs brought claims for damages, an injunction, and declaratory relief against the AAA, all of which were dismissed by the district court. The Seventh Circuit upheld the dismissal of the damages claim on the ground of arbitral immunity, and it upheld dismissal of the injunctive and declaratory claims because the AAA "[wa]s obviously not a real party in interest" to those claims. *Id*. at 844 n. 4. (concluding that the

district court "properly dismissed [the injunctive and declaratory] claims against the AAA under Rule 17(a). IMG could obtain all of the relief it seeks in Counts II and III in its claims against the Non-AAA Defendants."). The Seventh Circuit thus agreed with the district court's view that, under *Caudle*, "a claim intended to determine whether an arbitral body has the authority to proceed is one in which the arbitral body has no real interest." *International Medical Group, Inc. v. Am. Arbitration Association*, 149 F. Supp. 2d 615, 629 (S.D. Ind. 2001). That is precisely the type of claim the Carpenters Union asserts here, and it articulates no persuasive basis for distinguishing this case from *IMG*.

I now turn to the Carpenters Union's motion to dismiss Prime's counterclaim. The counterclaim seeks to enjoin the Carpenters Union from demanding that Anning-Johnson reassign the scaffolding work for the Zurich Project or pay damages arising out of its subcontract with Prime, and it further seeks to compel the Carpenters Union to submit any jurisdictional disputes it intends to pursue to the JCB. The Carpenters Union argues that the Norris LaGuardia Act divests me of jurisdiction to grant the injunctive relief Prime seeks, while Prime insists that in *Boys Markets, Inc. v. Retail Clerks Union, Local* 770, 398 U.S. 235 (1970), the Supreme Court explicitly authorized courts to issue injunctions in the circumstances alleged here.

The Norris–LaGuardia Act generally prohibits federal courts from enjoining labor strikes. *See* 29 U.S.C. § 104. But in *Boys Markets,*

the Court carved out an exception to the Act's anti-injunction provisions for cases in which the labor strike sought to be enjoined violated a no-strike obligation under a collective bargaining agreement that required arbitration of the dispute that prompted the strike. *See Boys Markets*, 398 U.S. at 237 (overruling *Sinclair Refining Co. v. Atkinson*, 370 U.S. 195 (1962)). The Court held that although the Norris-LaGuardia Act, construed literally, would prohibit courts from enjoining such strikes, the literal terms of the Act had to be "accommodated" to the purposes of arbitration. *Id*. at 250.

The parties' dispute over whether the *Boys Markets* exception applies to Prime's injunctive claim brings into focus their underlying disagreement over whether the Carpenters Union's claim against Anning-Johnson is, or is not, a "jurisdictional dispute." All agree that under the PLA, jurisdictional disputes are subject to mandatory arbitration by a JCB-selected arbitrator. In Prime's view, the Carpenters Union's August 14, 2015, letter to Anning-Johnson was intended to coerce Anning-Johnson to reassign the scaffolding work on the Zurich project to employees represented by the Carpenters Union, and thus was, in substance, a jurisdictional dispute. In the Carpenters Union's view, however, its letter to Anning-Johnson merely asserted liability for breach of the subcontracting clause of the Carpenters CBA but did not seek work reassignment, and thus was not a

jurisdictional dispute within the scope of the PLA's mandatory arbitration provisions.

I am not persuaded, based on the pleadings and the limited evidence before me, that dismissal of Prime's injunctive claim is warranted. That is not to say, of course, that Prime will ultimately prevail on this claim. The Carpenters Union correctly states that an employer seeking a *Boys Markets* injunction must demonstrate: (1) that the CBA imposes on both parties a mandatory duty to submit to binding arbitration; (2) that the dispute at issue is subject to the mandatory arbitration provisions, and (3) that ordinary principles of equity warrant an injunction. *Airborne Freight Corp. v. Int'l Bhd. of Teamsters Local 705*, 216 F. Supp. 2d 712, 715 (N.D. Ill. 2002). But none of the authorities the Carpenters Union cites supports dismissing an injunctive claim at the pleading stage for failure to establish these elements.

In response to Prime's invocation of *Boys Markets*, the Carpenters Union contends that its letter to Anning-Johnson did not breach the PLA because it "did nothing more than inform Anning-Johnson that it may have violated its Collective Bargaining Agreement with the Carpenters Union and that in certain circumstances, employees of an employer owes fringe benefits can be withdrawn from the job (sic)." Pl.'s Reply, at 2. But whether the letter breached the PLA is a merits question that cannot be resolved at this stage. Indeed, the Carpenters Union goes on to cite several cases that

examine, at considerable length, the murky distinction between jurisdictional disputes and disputes involving alleged violations of subcontracting clauses. These include *International Union of Operating Engineers, Local 103 v. Indiana Construction*, 910 F.2d 450 (7th Cir. 1990), *Miron Construction v. International Union of Operating Engineers*, Local 139, 44 F.3d 558, 566 (7th Cir. 1998), and *Hutter Constr. v. International Union of Operating Engineers, Local 139*, 862 F.2d 641, 645 (7th Cir. 1988). None of these cases was resolved at the pleadings stage, and all include substantial facts-based analysis.

For example, in *Operating Engineers, Local 103*, the court observed that a jurisdictional dispute "generally places the employer in a cross-fire between two unions," while in a "typical subcontracting dispute," "an employer subcontracts a part of the union's work to another employer that does not hire that union's employees." 910 F.2d at 453. The court went on, however, to observe that the "facts of this case defy the label of either a stereotypical jurisdictional or subcontracting dispute." *Id*. It then examined the summary judgment evidence and concluded that the district court had erroneously determined that the dispute was jurisdictional, since the only evidence it relied upon—a letter from the union to the employer demanding contribution to its pension fund—was consistent with the assertion of either type of claim. *Id*. at 455. The court then remanded the case for further proceedings. *Id*. *See also Hutter*, 862

F.2d at 644 (recognizing that "the distinction between jurisdictional and non-jurisdictional claims is often a matter of semantics," and that "jurisdictional disputes are sometimes disguised as other types of controversies...."). Similarly, in this case, the Carpenters Union's letter to Anning-Johnson can reasonably be construed as asserting either a jurisdictional dispute or a subcontracting dispute.

The Carpenters Union's argument that Prime has not established that an injunction is warranted under "ordinary principles of equity" is similarly premature. The Carpenters Union cites *Airborne Freight* to argue that Prime must show a likelihood of success on the merits to prevail on its injunctive claim. But the issue before me in *Airborne Freight* was whether to grant a *preliminary* injunction, not whether to allow a claim for injunctive relief to proceed past the pleadings. 216 F. Supp. 2d at 718.

Finally, although the Carpenters Union is correct that a party seeking injunctive relief must show more than merely speculative harm, *see, e.g., East St. Louis Laborers' Local 100 v. Bellon Wrecking & Salvage Co.*, 414 F.3d 700, 704 (7th Cir. 2005) (reversing grant of preliminary junction), and must further establish the inadequacy of money damages, I am not persuaded that Prime's allegations, taken as a whole, fail to satisfy the pleading standard of Rule 8 with respect to these elements of its claim.

III.

For the foregoing reasons, Resnick's motion to dismiss Count I as to him is granted, and the Carpenters Union's motion to dismiss Count I of Prime's counterclaim is denied.

**ENTER ORDER:**

_____
**Elaine E. Bucklo**
United States District Judge

Dated: February 19, 2016